IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

IN THE MATTER OF THE SEARCH OF:
PREMISES LOCATED AT 70 MOLLY's
POINT ROAD, SOUTHPORT, MAINE
04576

Case No. 2:23-mj-209-KFW

**FILED UNDER SEAL**

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, David C. Fife, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the
Federal Rules of Criminal Procedure for a warrant to search the premises located at 70
Molly's Point Road, Southport, Maine, 04576, hereinafter "PREMISES," further
described in Attachment A, for the things described in Attachment B. This application
seeks authority for a warrant to search for and seize evidence, fruits, and
instrumentalities of violations of Title 18, United States Code, Section 542 (entry of
goods by false statements); 18 U.S.C. § 545 (smuggling of goods into the U.S.); and 18
U.S.C. § 371 (conspiracy), as well as specific violations of the Emergency Economic
Powers Act ("IEEPA") (codified at Title 50, United States Code) and regulations issued
pursuant to IEEPA.

2.      I am a Special Agent (SA) with Homeland Security Investigations (HSI)
and have been since August 2009. I am currently assigned to HSI's Portland, Maine
office. I have participated in numerous criminal investigations, to include matters
involving the general smuggling of contraband into the United States, as well as
investigations involving the trafficking of illicit cultural property into the United States.

In my career I have utilized various investigative tools and techniques to include the use of search warrants.

3.     This affidavit is intended to provide the facts necessary for a determination of probable cause for the requested search warrant. The facts set forth in this affidavit are based on my personal knowledge, information obtained during my participation in this investigation, information from others, including law enforcement officers, my review of documents and computer records related to this investigation, and information gained through my training and experience.

### Legal Protections for Iraqi and Iranian Cultural Property

4.     The importation of Iraqi cultural property into the United States has been restricted since 1990, when the United States implemented a general ban on the importation of any Iraqi goods via the Iraqi Sanctions Regulations, codified at Title 31, Code of Federal Regulations, Part 575. In 2004, Title 31, Code of Federal Regulations, Section 575.533 was amended to lift the general ban while retaining more limited restrictions, including a ban on the importation of "Iraqi cultural property or other items of archaeological, historical, cultural, rare scientific, and religious importance illegally removed from the Iraq National Museum, the National Library, and other locations in Iraq since August 6, 1990." Pursuant to Section 575.533(b)(4), "[a]ny trade in or transfer of such items, including items with respect to which reasonable suspicion exists that they have been illegally removed" remains prohibited. In 2010, the Iraqi Sanctions Regulations were repealed and replaced with the Iraq Stabilization and Insurgency Sanctions Regulations, codified at Title 31, Code of Federal Regulations, Part 576. In particular, Section 576.208 prohibits "the trade in or transfer of ownership or possession of Iraqi cultural property or other items of archeological, historical, cultural,

rare scientific, and religious importance that were illegally removed, or for which a reasonable suspicion exists that they were illegally removed, from the Iraq National Museum, the National Library, and other locations in Iraq since August 6, 1990." The Regulation incorporates the criminal and civil penalties set forth in the International Emergency Economic Powers Act ("IEEPA") (codified at Title 50, United States Code, Section 1705). On April 30, 2008, U.S. Customs and Border Protection ("CBP") amended C.F.R. Part 12 to reflect the imposition of import restrictions on Iraqi archeological and ethnological materials. 19 C.F.R. § 12.104j.

5.      The importation of cultural property from Iran is similarly restricted.  The IEEPA and the Iranian Transaction Regulations ("ITR") promulgated thereunder, principally 31 C.F.R. § 560.201 Code of Federal Regulations, prohibit the importation of goods or services from Iran except as specifically authorized pursuant to federal regulation.

6.      The willful violation of a regulation promulgated pursuant to the IEEPA is punishable by a fine and imprisonment.  *See* U.S.C. § 1705(c).

7.      A person who first obtains a license from the Treasury Department's Office of Foreign Assets Control ("OFAC") can remove the import restrictions established by the IEEPA and the Code of Federal Regulations.

**SPECIFIC PROBABLE CAUSE**

**July 2022 Seizure of an Iranian Artifact at FedEx Indianapolis Hub**

8.      On/around July 7, 2022, United States Customs and Border Protection (CBP) Indianapolis, Indiana detained a mail parcel at the FedEx Indianapolis International Airport mail facility containing merchandise declared as an "Antique Stone Vase," with a commercial invoice on the exterior of the parcel stating an origin of

3

Great Britain and a value of $150.00. The shipment was sent by a "Patricia Karawani, D/B/A 'AtticArt Ltd,' 16 Bina Gardens Flat 2 London SW5 0LA, UK," to a "Susan Katzev" (hereinafter "Katzev") at the PREMISES. The parcel was detained by CBP at the FedEx Indianapolis facility for further inspection.

9.      Upon inspection, CBP officers discovered a small brown/black bowl with depictions of eagles and dragons along the outside. Examination of the object by the seizing officers, as well as subsequent photographic review by a CBP antiquities specialist in Washington, DC, resulted in the conclusion that it may be a genuine item of cultural property warranting additional scrutiny. As a result, the parcel and contents were detained pending further analysis.

10.      Open-source online research of "AtticArt Ltd" (hereinafter "AtticArt") conducted by HSI Indianapolis and CBP in the days following the detention revealed a virtually identical bowl as the one detained in Indianapolis listed for sale on the AtticArt auction website, "www.artemission.com." The bowl on the website was described as "Large Bactrian Chlorite Bowl with Eagles and Dragons, c. 2200 BC (Large Bactrian Bowl),"[1] with a listed price of $4,500. The description provided a provenance for the piece of "British private collection, acquired in the 1990 on the London market." I reviewed the website as and found it to offer dozens of other artifacts for sale from a variety of civilizations, including Northern European (Viking), Roman, Greek, and Egyptian/Central Asian. In most cases, the descriptions of the provenance of the items were exceedingly vague and/or very similarly written to those of many other objects

---

1. 'Bactrian' broadly refers to an ancient region/civilization of central Asia encompassing modern-day Iran, Afghanistan, Tajikistan, and Uzbekistan, dating from approximately 2500 BCE (Before the Common Era) to 1000 CE (Common Era). In my training and experience, and based on conversations with other investigators and experts, I know that 'Bactrian' is used as a very broad term in the antiquities world and can be used to muddle the true provenance of an item due to the large region it can encompass.

listed on the site. I additionally noted that in order to reserve or purchase any item from the website, one is required to create a profile on the site, which involves providing an email address, first name, last name, and country of residence. It did not appear that AtticArt had a physical gallery location in London open to the public, but rather that any transaction and/or communication occurred exclusively through the website and its associated payment portal.

11.     Following the detention in Indianapolis, CBP consulted experts knowledgeable in "Bactrian" antiquities and generalized antiquities from Afghanistan, Iran, and central Asia, which encompass the modern-day general region from which the detained item was suspected of originating. According to the experts consulted (who reviewed high-resolution images of the detained object), the item was determined to be not of Bactrian origin but rather from the Jiroft or Halil Rud Valley of modern-day southwestern Iran. Furthermore, according to the expert, this region is one featuring dozens of prehistoric graveyards that were heavily plundered in 2000/2001. The item itself was believed to date from around 2600-2400 BCE; the overall conclusion from the experts was that the piece most likely originated from modern-day Iran and had likely been looted.

12.     Because of the suspected Iranian origin of the piece, HSI Indianapolis conducted an inquiry with t OFAC to determine whether the UK shipper or Katzev had obtained a license to import Iranian goods into the United States. On August 11, 2022, OFAC responded that neither entity possessed such a license; as such, unless otherwise authorized, the importation into the United States of any goods or services of Iranian origin or owned or controlled by the Government of Iran, would be prohibited pursuant to § 560.201 of the Iranian Transactions  Regulations (ITR), (31 C.F.R. part 560), issued

under the authority of the International Emergency Economic Powers Act (50 U.S.C. §§ 1701-06), and other statutes. Following this OFAC determination, the item was formally seized by CBP and HSI Indianapolis for eventual repatriation to the Government of Iran upon any future normalization of diplomatic relations.

**October 2022 Seizure of an Iraqi Artifact in Portland, ME**

13.     As a result of the July 2022 seizure, in late September 2022, CBP alerted me to the pending shipment of another parcel from the same UK shipper to Katzev at the PREMISES[2] In this instance, the parcel was shipped via the British Royal Mail, which interfaces with the United States Postal Service (USPS) for delivery upon arrival in the U.S. I notified the U.S. Postal Inspection Service (USPIS) in Portland, ME about the incoming parcel and requested that it be detained for an extended border search under my border search authority as a customs agent.

14.     On October 5, 2022, U.S. Postal Inspector Emily Spera notified me that the parcel was in her possession at the USPS southern Maine sorting facility in Scarborough, ME. On the same date, I executed an extended border search of the parcel due to reasonable certainty that a recent border crossing had occurred (reflected by USPS tracking records of the parcel crossing into the U.S. at the JFK International Mail Facility in New York), and reasonable suspicion of criminal activity based upon the July seizure and earlier CBP seizures from the same UK shipper that were unrelated to

---

2. Depending on the commodity being shipped, a shipper outside the United States will generally file a customs declaration and/or import paperwork along with the shipment, during which a declaration is made regarding the contents, value, etc., of the item(s) being shipped. In many cases, this filing is accomplished by the express consignment shipping entity (FedEx, UPS, a national postal service, etc.) based upon the information entered by the shipper. This information is filed electronically with CBP as part of the normal import process for most express consignment parcels.

Katzev. Upon examining the parcel, which was unopened and appeared to be in an unchanged state since it had crossed the U.S. border in New York, I noted a customs declaration on the outside of the box declaring the contents as "Antique amulet over 250 years old," with a declared value of $150. Inside the box, I discovered a tan/cream colored stone carved in the shape of a seated ram; the item appeared to be a stone stamp or seal as it featured small carvings along the bottom of it. I further encountered an invoice/certificate of authenticity inside the box, dated September 29, 2022, and issued by "ArteMission (AtticArt LTD)." The invoice listed the item as a "Sumerian Steatite Ram Seal, c. 2800-2500 BC," with a cultural heritage described as "Sumerian."[3] The provenance of the item was listed as "British private collection acquired prior to 2000." A price for the item, presumed to have been the sale price, was listed as USD $792.[4]

15.     On/around October 17, 2022, I contacted several experts with Harvard University and the University of Chicago who were knowledgeable of Sumerian antiquities and generalized antiquities of Iraq/Iran, which represented the modern-day outline of the region from which the detained item was suspected of originating. According to the experts consulted (who reviewed high-resolution images of the seized object), the item was determined to not be Sumerian but rather from the Uruk

---

3. Sumer (Sumerian) refers broadly to an ancient civilization in the historical area of southern Mesopotamia, corresponding roughly to modern-day south and central Iraq. The civilization emerged between the 6th and 5th millennium BCE and spanned through approximately 1900 BCE.

4 The September notification I received from CBP for this shipment also referenced a second inbound Royal Mail shipment from AtticArt destined for Katzev at the PREMISES, which was due to arrive at almost the same time as the shipment containing the artifact described in Paragraph 14. I intercepted and searched the second shipment as well, which had been manifested on a customs declaration as "Antique ornament over 250 years old" and with a value of $150. Inside the parcel, I discovered a small black vase/pot with few distinguishing marks or notable characteristics. A sales invoice inside further described it as "Greek Pottery Bel Krater, 4th century B.C." with a price listed as $440 and a provenance of "Private London collection formed between 1980s-1990s, ex London auction." Due to the generic and undistinguished nature of the item, as well as the exceedingly vague nature of the provenance, I determined that an expert opinion would not be conclusive enough to establish the item as one imported contrary to law (apart from the clear undervaluation of the customs declaration). As a result, I released the shipment back into the mailstream on October 14, 2022, for onward delivery to Katzev by USPS.

civilization, which was a predecessor of the Sumerian civilization that also existed largely within the confines of modern-day Iraq, dating from 3500-3000 BCE. As a result of this finding, and the stated provenance declaration, I seized the item on October 24, 2022, for eventual repatriation to Iraqi authorities, pursuant to apparent violations of 19 C.F.R. § 12.104j (Emergency Protection for Iraqi Cultural Antiquities Act of 2004); 19 USC 1595a (Importations Contrary to Law); 18 USC § 545 (Smuggling); and 18 USC § 542 (Material False Statements).

16.     On October 18, 2022, I contacted a company email address listed on the invoice found within the detained parcel, info@artemission.com, to request any additional provenance paperwork for the item. On October 25, 2022, I received a response via email from an "Antoine Karawani" of "Atticart Ltd.", explaining that additional provenance paperwork did not exist but that he had himself acquired the seal as part of a personal collection in the "1980s and 1990s," and that "at the time" provenance paperwork for such items "[was] not required." I know from training and experience that traffickers in looted/stolen cultural property items will frequently claim that no provenance paperwork exists for an item, or that it came from an unverifiable "private collection," in order to obfuscate and/or 'launder' the true illicit origin of the antiquity. Additionally, I conducted research into the respondent, "Antoine Karawani," in CBP/HSI databases and noted that several earlier seizures of illicit cultural property (unrelated to Katzev) had been made from AtticArt, with Mr. Karawani specifically listed as the shipper.

**November 2022 Seizure of an Iranian Artifact in Portland, ME**

17.     In mid-October 2022, in the same manner described in Paragraph 13 above, I was again alerted by CBP to the pending shipment of a parcel from AtticArt to Katzev at the PREMISES. The shipment was again posted via the Royal Mail, and I therefore requested that USPIS Inspector Spera again detain the parcel when it arrived in Maine so that I could conduct an extended border search.

18.     On November 4, 2022, Inspector Spera notified me that the parcel was in her custody at the U.S. Post Office in Portland. On the same date, I executed an extended border search of the parcel due to reasonable certainty that a recent border crossing had occurred (reflected by USPS tracking records of the parcel crossing into the U.S. at the Miami International Airport International Mail Facility in Miami, FL), and reasonable suspicion of criminal activity based upon the July and October seizures from the same UK shipper. Upon examining the parcel, which was unopened and appeared in an unchanged state since it had crossed the U.S. border in Miami, I noted a customs declaration on the outside of the box declaring the contents as "Antique ornament over 250 years old," with a declared value of GBP 150. Inside the box, I discovered a black metal figurine depicting an ibex or other horned animal, which was hollowed out along the body portion of the animal and featured four small holes along the base of it, indicating that it may have once been attached to a larger item. I further encountered an invoice/certificate of authenticity, dated October 17, 2022, and issued by "ArteMission (Atticart LTD)." The invoice listed the item as a "Large Luristan Bronze Ibex Attachment, c. 1000 B.C.", with a cultural heritage described as "Luristani."[5] The

---

5. Luristan (also Lorestan) refers to the ancient civilization of the Lurs people that existed almost entirely within the borders of modern-day Iran, in the current Iranian province of Lorestan. The region is particularly known for its bronze artifacts, which were produced as far back as the 3rd millennium BCE through approximately 650 BCE.

provenance of the item was listed as "ex. Mr. A. Dajan collection, acquired in London prior to 2005." A price for the item, presumed to have been the final sale price, was listed as USD $2,464.

19.     On/around November 8, 2022, I contacted experts at Columbia University and the University of Chicago who were knowledgeable of Luristani antiquities and general ancient Persian artifacts. According to the experts consulted (who reviewed high-resolution images of the seized object), the object could not be conclusively defined as Luristani but was likely the creation of one of several civilizations spanning west/southwest Iran and produced between 1000 BCE and 0 CE. As a result of this finding, and the specific declaration on the invoice paperwork that the item was of Luristani origin and therefore from an ancient kingdom/region that existed almost exclusively within the borders of modern-day Iran, I requested a second inquiry from OFAC to determine whether AtticArt or Katzev had since obtained a license to import Iranian-origin goods into the United States. On November 14, 2022, OFAC responded that none of the requested entities possessed such a license; as such, unless otherwise authorized, the importation into the United States of this item was again prohibited by to § 560.201 of the ITR, (31 C.F.R. part 560), issued under the authority of the International Emergency Economic Powers Act (50 U.S.C. §§ 1701-06), and other statutes. Following this OFAC determination, I formally seized the item for eventual repatriation to the Government of Iran upon any future normalization of diplomatic relations.

**Additional CBP/HSI Border Searches - January, February, and March 2023**

20.    On January 23, 2023, I was alerted to another pending inbound parcel shipped from AtticArt in London to Katzev at the PREMISES, this time using the DHL Worldwide service instead of FedEx or the Royal Mail/USPS.[6] In this instance, the parcel was successfully intercepted on January 25, 2023, by CBP at JFK International Airport's DHL cargo facility, where it was searched pursuant to CBP's border search authority. Inside the parcel, officers discovered a small red amulet in the form of a bird, and, upon comparing it with items listed for sale on the Artemission.com website, found it to be an exact match to an item offered as an "Egyptian Red Jasper Ibis Amulet of Thoth, 900 B.C.", listed for sale online at $900. This same item additionally featured a "SOLD" banner over it on the website. The provenance provided for the piece was "British private collection, acquired prior to 2000." The item was declared on the DHL shipping manifest/proforma invoice as "Antique ornament over 250 years old," with a value of GBP 250.

21.    Upon expert analysis, the item was determined to likely be authentic and Egyptian, but because the precise date of export from Egypt could not be definitively established based upon the vague provenance provided by AtticArt, a basis for seizure under existing laws and/or US treaties with Egypt could not be firmly established by CBP. The item was therefore released by CBP for onward delivery to Katzev on January 25, 2023.

22.    On February 17, 2023, I was again alerted to another pending inbound DHL parcel shipped from AtticArt in London to Katzev at the PREMISES, and on the

---

6. In my training and experience with cultural property and general smuggling investigations, I know that shippers will sometimes change the express consignment services they use if they experience disproportionate seizures of their shipments through one service versus another. In these cases, the shippers/smugglers may believe that a faster and/or private shipping service will be harder for customs authorities to intercept at a port of entry or may be undetectable if the authorities are monitoring only the government's own mail service.

same date I alerted the DHL facility in Westbrook, ME to request that they hold the shipment upon arrival in Maine for me or my colleagues to search it. On February 22, 2023, HSI Portland SA Christopher Fitzpatrick met with DHL and conducted an extended border search of the parcel in Westbrook at my request. Inside the parcel, SA Fitzpatrick discovered a small metallic vase/vessel with what appeared to be three ram heads protruding from the side, along with a small metal stirrer/stick with what appeared to be a bird on top. SA Fitzpatrick also discovered an invoice and certificate of authenticity inside from ArteMission/AtticArt Ltd., which described the piece as a "Bactrian Bronze Cosmetic Vessel and Stirrer with Bird and Ram Heads, c. 2000 B.C.", along with a listed sale price of $792. As with the January shipment, a manifest/proforma invoice found on the outside of the box described the item as "Antique ornament over 250 years old" with a declared value of GBP 250.

23.     On February 24, 2023, I emailed photos of the item to an expert I had previously consulted at the University of Chicago in an effort to determine both the authenticity and likely provenance of the item I had detained. On the same date, the expert responded that the item appeared genuine and of likely Bactrian cultural origin, but noted that while ancient "Bactria" overlapped significantly with modern-day Afghanistan – which has experienced significant looting and is subject to a new and broad U.S. ban on the import of virtually all of its antiquities – it also overlapped with Uzbekistan, Tajikistan, and other modern nations that are not subject to the same restrictions. Due to the ambiguity of the expert analysis, I concluded that I did not have a strong basis to formally seize the item, and it was returned to DHL for onward delivery to Katzev on February 27, 2023.

24.    On/around March 9, 2023, I was once again alerted to a pending inbound FedEx parcel destined to Katzev at the PREMISES, though this time the shipper was listed as an auction house based elsewhere in the United Kingdom,[7] as opposed to AtticArt/Artemission. On March 13, 2023, the parcel was intercepted, detained, and inspected by CBP at the FedEx Memphis Global Hub in Memphis, Tennessee, and found to contain what appeared to be stucco head, seemingly of a man. Images of the item and an invoice found within the parcel were sent to me; according to the invoice, the item was described as "Roman Stucco Head of a Bearded Man, Provincial, 2nd-3rd Century AD," with a listed provenance of "1970s-1996, Property of a North American collector."

25.    On March 15, 2023, I submitted images of the detained item to an expert at the University of Pennsylvania, who subsequently responded that the item appeared far too clean and crisp, and stated that it did not resemble ancient Roman plasterwork nor was the shape/form of it consistent with what would have been produced in the stated time period. Consequently, the expert concluded that it was fake, and was created with modern tools in the present era. Had the piece been genuine, however, it may have been subject to import restrictions as a "designated list" item for Italian cultural property encompassing the Imperial Roman period. But as it was likely fake, I requested that CBP release it from detention and allow it to proceed to Katzev at the PREMISES.

**March and June 2023 Seizures of Iranian Artifacts in Portland, ME**

---

7. I know from prior investigations, conversations with other HSI investigators, and a review of DHS seizure databases that this particular auction house, which shall remain unnamed to preserve ongoing investigations, has been the subject of numerous express consignment seizures of illicit cultural property items destined for consignees in the U.S. These seizures occurred over the span of several years, with some seized items having been subsequently confirmed to be looted from locations in Egypt, Yemen, and elsewhere in the Middle East/Mediterranean region.

26.     In mid-March and mid-June 2023, I again received notifications from CBP of pending shipments from AtticArt to Katzev via DHL, and I again intercepted both parcels upon arrival in Portland, ME in order to conduct extended border searches based upon the prior discoveries. The search of the March parcel, which was manifested as "Antique Ornament over 250 years old" and destined to Katzev at the PREMISES, revealed a small round vessel inside, which was described in an accompanying certificate of authenticity/invoice as "Bactrian Decorated Chlorite Vessel, c. 2200 B.C." The provenance of the item was listed as "British private collection, acquired in the 1990s on the London art market," with a sale price of USD $704. I again consulted an expert at the University of Chicago knowledgeable in Bactrian antiquities, who determined that the item appeared to be authentic and that it very likely originated from within the borders of modern-day Iran. A subsequent query with OFAC again revealed that neither Katzev nor AtticArt held valid import licenses for such an item of Iranian origin; I therefore seized the item on April 20, 2023 as being prohibited by to § 560.201 of the ITR, (31 C.F.R. part 560), issued under the authority of the International Emergency Economic Powers Act (50 U.S.C. §§ 1701-06), and other statutes.

27.     I inspected the second parcel at the DHL facility in Westbrook, ME on June 20, 2023, and found it to also be manifested as an "Antique ornament over 250 years old." In this instance, however, I noted that the parcel was addressed not to Katzev at the PREMISES but rather to "Mrs Katzev" at a specific address on Molly's Point Road in Southport, Maine.[8] Katzev's email address and phone number were nevertheless

---

8. On the same date, I consulted public records databases for the specific address listed on the parcel and learned the last name of the present occupants of the residence at that address.  In addition to the specific address, the last name of the occupants is on the parcel.  I have not included that information here in order to protect their privacy.  It appears that the listed address is a few houses up the street from the PREMISES.

listed on a proforma invoice affixed to the outside of the parcel. Inside the parcel, I encountered a small bronze item in the form of a winged creature or sphinx, with a hole in the center; no additional paperwork whatsoever accompanied the item inside the box. However, I consulted Artemission.com, and discovered what appeared to be the exact same item listed as a "Luristan Bronze Sphinx Horse Attachment, C. 900 – 600 B.C." The provenance for this piece was described as "British private collection, acquired prior to 2000," with a sale price of USD $800. As with the previous Luristani item, I consulted an expert at Columbia University, who upon review of the photos I sent stated that the item did appear to be a Luristani bronze horse cheek bit from present-day Iran, dated from around 800 BC. With this information, I again queried OFAC and found that neither Katzev, the occupants of the listed address on the parcel, nor AtticArt held valid import licenses, and seized the item pursuant to the corresponding violations.

### Review of Import Filings, Financial Data, and Katzev's Gmail Account

28.     On/around November 14, 2022, I reviewed a spreadsheet consisting of all international express consignment imports destined for Katzev's Southport, ME address (with the exception of each of the 2023 shipments referenced above). This list was provided to me by CBP and was drawn from information provided by shippers and/or express consignment shipping companies and ingested into U.S. government import databases. The list contained approximately 143 import shipments, 138 of which occurred between February 2015 and November 2022. Of these shipments, I noted a total of 40 imports were made from AtticArt to Katzev at the PREMISES made between May 2020 and October 2022, to include each of the three shipments described in Paragraphs 8-19 above. All were manifested in the same generic manner as the

shipments I and HSI/CBP Indianapolis had seized in 2022 and 2023; namely, "Antique ornament/amulet/ implement over 100/250 years old" with declared values ranging from $0 to $150. I additionally noted many earlier imports from the UK auction house referenced in Paragraph 24 destined to Katzev at the PREMISES, among other apparent auction houses and antiquities dealers.

29.    I further noted that on 17 of the AtticArt shipments, which encompassed every shipment from July 2021 to November 2022 (with the sole exception of the shipment seized in Indianapolis described in Paragraphs 9-11 above), the email address "susankatzev@gmail.com" appeared in a field labelled "Bill-Consignee-Contact-Other 1." In conversations with CBP, I learned that this field is an optional field on the import/customs paperwork that contains additional contact information input by the shipper based on information provided to them by the consignee. In this instance, it appeared to reflect that Katzev had either used her email address during the online purchase of the shipped item(s) or had specifically provided it to the shipper as a means of contact for the shipment, payment, or other actions associated with the importation of the item(s). Furthermore, it indicated that her purchase of antiquities from AtticArt had involved – either entirely or in part – the use of a computer or other device capable of internet access.

30.    On October 18, 2022, I caused the issuance of a summons to PayPal for any account or information associated with Katzev or her email address, as I had noted on the Artemission.com website that PayPal was a preferred means of payment for the antiquities offered for sale there.[9] On/around October 28, 2022, I received a response

---

9. PayPal is a payment platform with a website and a phone app that enables payments between parties through online money transfers that do not expose the banking information of either party. An email address is required to

from PayPal, which revealed that Katzev's email address had been associated with 9 different PayPal accounts that had been opened and/or were operational between 2008 and 2022. For every account, the subscriber information listed either the PREMISES, Katzev's P.O. Box, or both, as the account subscriber's address; the PREMISES or P.O. Box was also listed as the shipping address for almost every item purchased across all nine accounts. I reviewed the transactional activity for these accounts and found that some showed little or no payment/money transfer activity whatsoever, while others reflected tens of thousands of dollars of payments/money transfers. For the latter accounts, which spanned many years, it appeared that the majority (and in some cases entirety) of Katzev's payments/transfers were sent to antique dealers, auction houses, galleries, or art studios, and were made for the purchase of what appeared to be antiques or works of modern art. However, in these records I found only one instance of a PayPal payment made directly to AtticArt, and this instance predated the imports I reviewed on the CBP list described in Paragraph 24. Consequently, PayPal was likely not the primary means of payment Katzev used for her purchases from AtticArt.

31.     On March 10, 2023, I sought and obtained a federal search warrant (2:23-mj-50-KFW) for Katzev's Gmail account, susankatzev@gmail.com. I submitted the warrant to Google on/around the same date, and received a response from the company on March 24, 2023, which consisted of approximately 50GB of data covering the period from about January 2022 to about February 2023. I reviewed the results over the following weeks and months, and found that Katzev had used the email account for

---

sign up for an account, and is generally used (in conjunction with a phone number) to directly transfer funds to another user. Funds can be transferred to any email address or phone number, whether or not the recipient has a PayPal account. For the sender and recipient of funds, however, an email address is crucial to the operation of the platform.

correspondence with representatives of AtticArt on a few occasions, mainly to inquire whether a specific item was still available for sale and/or to express interest in purchasing it. However, I did not find correspondence pertaining to all of the items originating from AtticArt that I had seized or examined, let alone all of the items that customs records reflected she had imported from the gallery since 2020.

## COMPUTERS, ELECTRONIC STORAGE
## AND FORENSIC ANALYSIS, AND FURTHER BACKGROUND

32.     As described above and in Attachment B, this application seeks permission to search and seize records that might be found on the PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

33.     *Probable cause*. I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating systems or application operations, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

34.      *Further background regarding the unlawful importation of cultural property.*  As set forth above, probable cause exists to believe that an individual at the PREMISES has unlawfully smuggled and imported cultural property and prohibited goods into the United States and attempted to do the same. Based upon my knowledge and experience, and the training and experience of other law enforcement officers with whom I have had discussions, I know the following about individuals involved in such crimes:

a.      Those who import or possess and collect such items may retain published and unpublished material, such as auction and exhibition catalogs, articles

about archeological and ethnological items, export and import compliance newsletters, and similar resources relating to the purchase and sale of these items.   They may retain these materials in paper and/or for many years and in a variety of media, including photographs, magazines, other visual media.

      b.    It is common for these individuals to maintain books, records, receipts, ledgers, notes, and bank and payment records relating to the purchase of these items.  These books, records, receipts, ledgers, notes, and bank and payment records are often kept where the individual has ready access to them including their residences. These individuals often retain this information for many years.

      c.    These individuals commonly maintain books, papers, or other records that reflect names, addresses, and other contact information for individuals and entities who are involved with them in the importation, purchase, and sale of these items.  They also commonly retain email and written correspondence with these individuals and entities.

      d.    These individuals, or those who attempt to commit these crimes, often maintain the aforementioned documents and materials in a safe, secure and private environment, such as a computer and surrounding area.

      e.    It is also common for these individuals to collect cultural items that are not prohibited from importation or possession. These individuals often have collections that include both lawful and unlawful acquisitions. The lawful purchases and acquisitions are often acquired at fair market value, from a reputable entity or person, and with supporting documentation and material to establish the item's provenance and origin. The acquisition and collection of these lawful items can give the appearance of legitimacy to an individual's entire collection because the person can, among other

things, display the lawfully-acquired items. All of the aforementioned documents and materials are retained in the same way by these individuals for these lawful acquisitions and provide important evidence of an individual's knowledge of import and export laws and regulations and OFAC licensing requirements.

35.   Because collectors of cultural items can collect both prohibited and lawfully-acquired items, an expert in the archeology and cultural heritage of ancient cultures of the Middle East has agreed to assist agents as needed during the search (via videoconference) by providing cursory assessment/opinion regarding items encountered during the search that agents suspect may represent illicit cultural property pieces. This suspicion may be aroused either by direct association of a particular object with a corollary invoice/import document found within the residence, statements from occupant(s) of the residence regarding a particular object, or the fact that the object bears an aesthetic similarity to other objects that have been previously seized in transit to the PREMISES from AtticArt. Upon identification of such items, agents will videoconference with the expert in an effort to obtain more insight into the possible origin of the item in order to determine whether it may have been subject to import restrictions. The expert, who specializes in ancient Iraqi and Syrian civilizations but who possesses an archaeological background and knowledge of broader ancient civilizations throughout the Middle East, will render a cursory assessment to enable agents to determine which cultural items to photograph/document for a subsequent, more thorough determination of provenance.

36.   *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that

establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any computer in the PREMISES because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is

analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.

    c.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit

a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

d.       A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

e.       The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

f.       Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

37.     *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the

premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.     **The time required for an examination**. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.     **Technical requirements**. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the PREMISES. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.    **Variety of forms of electronic media**. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

38.    *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.

Dated at Portland, Maine this 25th day of July, 2023.

David C. Fife, Special Agent
Homeland Security Investigations

Sworn to telephonically and signed
electronically in accordance with the
requirements of Rule 4.1 of the Federal Rules
of Criminal Procedures

Date:   Jul 25 2023

City and state:   Portland, Maine

*Judge's signature*

Karen Frink Wolf,  U.S. Magistrate Judge
*Printed name and title*

26